IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

BENNETT BRADFORD                                          PLAINTIFF

           v.              Civil No. 05-4069

COMMISSIONER, SOCIAL SECURITY
ADMINISTRATION                                            DEFENDANT

## MEMORANDUM OPINION

Now on this 20th day of March, 2007, comes on for consideration plaintiff Bennett Bradford's appeal for judicial review of the decision of the Commissioner of the Social Security Administration, denying him supplemental security income ("SSI") benefits under the Social Security Act.

1.   The Court's role upon review of the decision of a Social Security Administrative Law Judge ("ALJ") is to determine whether the decision is supported by substantial evidence on the record as a whole.  **Ramirez v. Barnhart**, **292 F.3d 576 (8th Cir. 2002)**. Substantial evidence is less than a preponderance but enough that a reasonable mind would find it adequate to support a conclusion. *Id.*  The Court must consider not only the evidence supporting the ALJ's decision, but also that which fairly detracts from it, and must affirm if the record -- viewed as a whole -- contains substantial evidence to support the decision. *Id.*   The Court may not reverse simply because the record also contains substantial evidence that would have supported a contrary decision. **Haley v. Massanari**, **258 F.3d 742 (8th Cir. 2001)**.

The burden rests on the claimant to prove that he has a disability, mental or physical, that has lasted -- or can be expected to last -- at least one year and that prevents him from engaging in any substantial gainful activity. **Pearsall v. Massanari, 274 F.3d 1211 (8th Cir. 2001).**

2.   Bradford filed the application for benefits now under consideration on October 23, 2003.  At the time of the hearing before the ALJ, on April 21, 2005, Bradford was 41 years old.  He had a 10th grade education, and no relevant past work experience, apparently not having been gainfully employed since about 1990.

The ALJ recognized that Bradford had been denied on two previous applications for benefits, and denied an implicit request to reopen those determinations, but did consider all past medical evidence to the extent that it had bearing on Bradford's current claim.

On June 24, 2005, the ALJ issued an unfavorable decision on Bradford's claim.  He found that Bradford has a seizure disorder and "subjective allegation of shortness of breath with prolonged heavy exertion," but that these impairments do not meet or medically equal the impairments listed in Appendix 1, Subpart P, Regulations No. 4.  The ALJ then went on to determine Bradford's residual functional capacity ("RFC").

The ALJ discredited Bradford's subjective complaints of exertional and non-exertional impairments of such severity as to

be disabling.  He discredited the testimony of Bradford and his mother that Bradford experienced seizures despite taking anti-seizure medication as prescribed, because the medical evidence indicated that Bradford did not take his medication as prescribed, and repeatedly sought treatment for seizures when he had been off his medication and drinking alcohol.  Bradford did not attribute his failure to take seizure medication to side effects or cost.

The ALJ discredited Bradford's testimony of severe headaches following seizures because there was little evidence of treatment for headaches and no physician had suggested a diagnostic workup for them.

The ALJ also noted that none of Bradford's physicians had made objective findings indicative of disability, nor had they restricted him from all gainful activity.

The ALJ found that Bradford is capable of performing a significant range of light work, which involves lifting no more than 20 pounds at a time, and frequently lifting or carrying up to 10 pounds, along with "a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  He then posed a hypothetical question to a Vocational Expert, asking whether there would be jobs in the economy for a person of the age and educational level of Bradford, who could perform light work which does not require climbing, driving, or working at unprotected heights or near dangerous

-3-

moving machinery.  The Vocational Expert responded that such jobs do exist in significant numbers, to include various assemblers, production workers, semi-conductor processors, and fabricators.

      3.   Bradford contends that the ALJ erred in the following respects:

      *   in finding his testimony less than fully credible;

      *   in finding that his only functional limitations were seizure precautions (not working at unprotected heights or around dangerous machinery);

      *   in finding he has the residual functional capacity to perform a significant range of light work;

      *   in finding that there are significant numbers of jobs in the national economy that he can perform; and

      *   in finding that he is not disabled.

The Commissioner contends that the decision made in Bradford's case was without error, and should be affirmed.

      4.   The Administrative Record reflects the following significant facts:

      *   On August 3, 1992, Dr. Lowell Harris noted that Bradford had been seen in the emergency room "with what his family called a seizure."  All test results were within normal limits, and Dr. Harris was not certain that Bradford had had a seizure, but he prescribed 100 mg. of

-4-

Dilantin[1], three a day, divided into morning and evening doses.

* On November 23, 1992, Dr. Harris - finding no medical basis for Bradford's complaints of abdominal pains and vomiting - noted that "I really think what he needs to do is to get on an exercise program and get back to work.  He swears there is no way he can ever work but I think that is partly in his mind."

* On May 14, 1993, Dr. Harris noted that Bradford complained of "nonspecific symptoms such as sharp pains in his head, weakness, poor appetite."  X-ray showed "the old scarring in the upper lungs that probably is secondary to his blastomycosis[2] that he never did get complete treatment for."

* On May 17, 1993, Bradford was admitted to the hospital "post seizure with a postictal[3] state," thought to be related to fever.

* On June 4, 1993, Bradford was hospitalized with severe headache and fever.  He was discharged with a diagnosis of fungal meningitis.  The History and Physical done at

---

[1]Dilantin, or phenytoin, is an anti-epileptic drug.  Abrupt withdrawal from the drug can precipitate seizures.  Alcohol consumption can affect the usefulness of the drug. Dizziness and headache are recognized adverse reactions.  Physicians' Desk Reference, 1995 Ed.

[2]"A chronic lung disease originating from a soil fungus.

[3]"Ictal" means "[r]elating to or caused by a stroke or seizure." Stedman's Medical Dictionary, 28th Ed.

this admission noted that Bradford "had some seizure activity in August of 1992 but none since that time until now."

* On August 26, 1993, Bradford went to the emergency room following a seizure, and Dr. Timothy Wilson noted that he had "stopped taking his medications approximately 3 weeks ago."  The diagnosis was "[s]eizure disorder status post seizure secondary to stopping medication," and the plan was to get back on the Dilantin regimen that Dr. Harris had prescribed.

* On April 17, 1994, Bradford went to the emergency room complaining of seizures.  He told the nurse that he had had seizures in the past but had never been medicated for them.  The Physician's Assessment noted that Bradford had had seizures several times in the past, usually after drinking alcohol.  The diagnosis was seizure activity secondary to acute alcoholism.  He was discharged with the specific instruction "do not drink alcohol."

* On December 11, 1996, Bradford underwent a physical examination in connection with an application for Social Security disability benefits.  His alleged impairments were seizures (once a month) and headaches (following the seizures).  He was taking no medications at the

-6-

time.  The examiner's diagnosis was "Grand mal epilepsy uncontrolled."

* On February 23, 1998, Bradford went to the emergency room with complaints of epigastric pain of about a week's duration.  Dr. James Forest-Lam noted "a history of seizures, a history of alcohol, heavy consumption," with reported "seizure like activities, which probably was not a seizure . . . [i]t appeared to be psychogenic seizure."  Bradford reported having a seizure "many months ago," and having stopped taking anti-seizure medication "months ago."  He was instructed to "abstain from alcohol use."

* On April 1, 1999, Dr. Joseph Greenspan examined Bradford for the Texas Rehabilitation Commission, specifically evaluating "seizures and breathing problems."  Bradford reported "approximately two seizures per month," and denied "taking or having been prescribed seizure medication."  He was on no medications at that time.  Dr. Greenspan noted Bradford's history of "heavy alcohol consumption," and assessed his seizures as "probable withdrawal seizures."

* On October 11, 1999, Bradford was admitted to the hospital, where Dr. Edward Hord noted a history of seizure disorder, noncompliance with medications, and "a

-7-

history consistent with alcohol abuse." He was "unsure whether this was a seizure disorder or alcohol withdrawal." The History and Physical for that admission noted that Bradford reported two or three seizures a week which he said were "unrelated to alcohol consumption," but that he drank "three to four beers a day as he can afford it." During that hospitalization, Bradford had an electroencephalogram, which was reported as normal. He was discharged on Dilantin, 100 mg. twice a day.

* On October 20, 1999, Dr. Hord noted, during a follow-up visit from the October 11 hospitalization, that Bradford had been taking only one 100 mg. Dilantin a day, and had been having episodes of "aura[4], which usually precedes his seizures." Dr. Hord suggested he take 300 mg. of Dilantan daily.

* On November 17, 1999, Bradford consulted Dr. Hord with the chief complaint "I need my seizure medicines." He also asked Dr. Hord about applying for Social Security benefits. Dr. Hord refilled the prescription for Dilantin, and directed Bradford to the Social Security office to fill out an application.

---

[4]An epileptic ictal phenomenon perceived only by the patient, or a subjective symptom that appears at the onset of a migraine headache. Stedman's Medical Dictionary, 28th Ed.

-8-

* On February 7, 2000, Dr. Green completed a Treating Physician's Report For Seizure Disorder. He indicated that Bradford had two seizures a month, although the most recent reported seizure had been in December, and noted that Bradford had started taking Dilantin, 3 times a day, in October.

* On February 18, 2000, Bradford was seen in the emergency room after having a seizure. Dr. Malcolm MacHauer noted that Bradford gave a history of "breakthrough occasionally despite taking his Dilantin. He is a non-compliant on Dilantin though and felt taking levels of this would be worthless. He drinks very heavily, moderate alcohol ingestion on a chronic basis. Doesn't really believe his seizure is related to his alcoholism. He hasn't really slowed down his consumption of any significance." Bradford was intoxicated when he presented to the hospital, and told the nurse that he "has not been taking Dilantin." He was discharged with a prescription for Dilantin, which Dr. MacHauer noted in the chart "I doubt he will even get filled."

* On August 15, 2000, a chart note at the AHEC clinic indicated that Bradford had had a seizure a week or so before, and had been "out of seizure med[ication] & can't afford it (has been out 'about' 2 mo[nths]." The

assessment on that visit included non-compliance with medications and alcohol abuse, and the plan was to restart Dilantin 300 mg. a day.

* On August 16, 2000, a chart note from an unidentifiable source indicates that Bradford "came in today to get assistance [with] his Dilantin. He was under the impression that he could get his medicine free at this clinic. . . . I will assist [with patient] medicine as nec[essary]."

* On August 29, 2000, a chart note indicated that Bradford was not taking Dilantin, and not having seizures. He was at the office for a pain in his side. The chart indicated that Bradford said that he could "get Dilantin for $12/month but chooses not to."

* On October 24, 2003, Bradford filled out a Disability Report, in which he indicated that his ability to work was limited by seizures, lightheadedness, and dizziness, and that he never knew when these conditions would occur. Dilantin had been prescribed. In a Disability Supplemental Interview Outline completed that same day, Bradford indicated that he suffered from unusual fatigue, and required a two-hour nap daily. He indicated that he took Dilantin 100 mg. three times daily, and that it made him sleepy. He also stated that

-10-

he had pain in his head that would last a "couple hours," caused by standing a long time.  He indicated that he could stand or walk for three hours before experiencing pain, and sit for four to six hours.

* In an undated Pain Report, Bradford indicated that he experienced throbbing pain in his head whenever he had seizures, lasting two hours or longer.  He attributed this pain either to the seizures themselves, or to hitting his head when falling during a seizure.  He indicated that he had been taking Dilantin three times a day, every day, since 1993, with side effects including dizziness, instability, and that it kept him from "moving around" at times.

* In an undated Daily Activity Questionnaire, Bradford indicated that he avoided physical labor or walking long distances because he never knew when a seizure would come on, and being hot or tired or moving around a lot triggered the seizures.

* On January 16, 2004, Bradford filled out a Statement of Claimant, in which he indicated that he could not tell when a seizure was coming on, and when he came to after a seizure, he would wake up with a "heavy headache," dizzy, weak, shaky, and unstable. He indicated that he had had two seizures in the past month, and that he was

taking phenytoin and Dilantin.

*   On February 5, 2004, Bradford saw Dr. Roshan Sharma on referral from the Texas Rehabilitation Commission. His chief complaints were headaches and seizures. Frequency of seizures was recorded as twice a week in one place, twice a month in another. Other than that, Bradford reported that "he had been fine." Bradford gave a history of seizures since 1993, and "does not know if there was an initiating factor." He was taking no medications at the time, stating that he could not afford them, but also stated that he had no side effects from any medications. He reported that he was not drinking alcohol at all, having stopped a year ago. Dr. Sharma found no functional restrictions, and indicated that "[p]rognosis and compliance with proper therapy is good."

*   On February 23, 2004, Dr. Walter Buell completed an RFC evaluation on Bradford, finding no restrictions on his activity other than seizure precautions.

*   On April 21, 2005, Bradford filled out a form indicating that he was currently taking Dilantin for seizures. That same day he testified before the ALJ that he had been taking Dilantin for "[g]ive or take around about two or three" years, but that he had one or two seizures

a week in spite of the medication.

\* On June 24, 2005, the ALJ issued his unfavorable decision. Also on June 24, 2005, Bradford was admitted to the emergency room following a seizure. He had not taken his Dilantin in four weeks, which he said was due to inability to pay for it. He also said that he had had a seizure three weeks ago. He was discharged with instructions to take Dilantin "as ordered."

\* On September 16, 2005, the Appeals Council denied Bradford's request for review, making the decision of the ALJ the final decision. This appeal followed.

5. The Court finds no error on the part of the ALJ in finding Bradford's testimony less than fully credible. Bradford had told several medical care providers in the past that he had never been prescribed medication for his seizures - which was untrue - and testified to the ALJ that he had been on the medication for only two or three years, when he had actually been prescribed the medication repeatedly and consistently for some twelve years. He testified that he had one or two seizures a week despite being on the medication. This is not consistent with his history, which is one of hospital visits for seizures following periods of time when he had not been taking his medication. There is no question that he did not stay on the Dilantin regimen as prescribed, and that failure also weighs against his crebidility.

-13-

**Guilliams v. Barnhart**, 393 F.3d 798, 800 (8th Cir. 2005).

Bradford also gave inconsistent reports about side effects from the Dilantin, sometimes saying it made him sleepy, sometimes saying he had no side effects.  He testified that his past alcohol use was "[p]robably around about two cans or three cans a week, something like that, every other week," when his medical records indicate heavy alcohol consumption, alcoholism, and the strong possibility that his seizures were triggered by alcohol.  He testified that no doctor had told him that the seizures were related to alcohol use, which is not consistent with the medical records.

The Court defers to the ALJ's credibility evaluation, because the ALJ is in a better position to evaluate credibility, **Guilliams, supra**, and there is certainly substantial evidence in the record as a whole to support the ALJ's finding that Bradford is not a credible witness.

6.  The Court also finds no error in the ALJ's determination that Bradford was capable of light work with no functional limitations except the seizure precautions of not working at unprotected heights or around dangerous machinery, and that he could perform a significant range of light work.  None of Bradford's many treating physicians, nor any reviewing physicians, imposed any work-related limitations on him other than seizure precautions.  Additional limitations could only be based on

-14-

Bradford's testimony, which was not fully credible. Notwithstanding that, the ALJ did find that Bradford should do no more than light work, with lifting restrictions consistent with what Bradford said he could do.

7.   Nor did the ALJ err in finding that there are significant numbers of jobs in the national economy that Bradford can perform.  The ALJ posed a proper hypothetical to a qualified Vocational Expert, and relied on his testimony in this regard.

8.   Finally, the ALJ did not err in finding that Bradford was not disabled at any relevant time period.  While recognizing that Bradford suffered from seizures, the ALJ also took into account that Bradford was noncompliant with his seizure medication, and continued to drink alcohol.  Both are factors known to trigger seizures in susceptible persons.  The evidence strongly suggests that had Bradford quit drinking alcohol and taken Dilantin as prescribed, he might very well have avoided seizures altogether, or at least would have reduced their frequency.  The record does not record hospital visits for seizures at times when Bradford was taking Dilantin.  If the seizures were to stop, the associated headaches and dizziness would also likely stop.  Impairments that are amenable to treatment are not disabling.  **Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999)**.

While there are suggestions in the record of other conditions

which have, in other circumstances with other claimants, been found disabling (degenerative disc disease, shortness of breath, fatigue), there is no substantial evidence that any of these conditions was disabling to this claimant in the time period for which benefits were sought.

9.    For the foregoing reasons, the Court finds that the decision of the Commissioner in this matter should be affirmed, and Judgment to that effect will be entered concurrently herewith.

**IT IS SO ORDERED.**

**  /s/ Jimm Larry Hendren**
**JIMM LARRY HENDREN**
**UNITED STATES DISTRICT JUDGE**

-16-